**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:11-cr-00082** |
| | ) | **Judge Trauger** |
| **[2] BETTY GENTRY** | ) | |

## MEMORANDUM

Defendant Betty Gentry has filed a Motion to Suppress Search Warrant (Docket No. 825) with a supporting Memorandum (Docket No. 826), to which the government filed a Response in opposition (Docket No. 913). For the reasons stated herein, the motion will be denied.

## BACKGROUND

This case broadly concerns allegations that Betty Gentry and other individuals participated in and/or facilitated illegal narcotics trafficking and related criminal activities coordinated by her son, Travis Gentry. As part of its pre-indictment investigation into activities by Travis Gentry's alleged Drug Trafficking Organization ("Gentry DTO"), the government undertook a number of investigate measures. Among other investigatory methods, the government: (1) obtained wiretaps for phones utilized by Travis Gentry and his associate Kejuana McCutcheon; and (2) at the conclusion of its investigation, obtained search warrants for the residences of various individuals alleged to have participated in or assisted the Gentry DTO, including Betty Gentry. Through the wiretaps, the government obtained information that allegedly implicates Betty Gentry, among others, in criminal activity. Through execution of a search warrant at her home, the government obtained evidence that allegedly implicates her and/or other defendants in criminal activity.

Betty Gentry, joined by other defendants, filed a separate motion to suppress evidence gleaned from the wiretaps, which the court has denied. (*See* Docket Nos. 940 (Memorandum) and 941 (Order).) In rendering its decision, the court found, *inter alia*, that (1) the affidavits supporting the first wiretap application (and subsequent applications) had sufficiently established for the Magistrate Judge the veracity, reliability, and basis of knowledge of the two confidential sources developed by the government;[1] and (2) those affidavits had established the requisite probable cause.

Here, Betty Gentry has separately moved to suppress evidence seized during execution of the search warrant at her home, which she contends was not supported by probable cause. On March 16, 2011, the government filed its search warrant applications, including the search warrant relating to Betty Gentry's residence, under seal before the Magistrate Judge (hereinafter "Issuing Judge"). The Issuing Judge has since granted the government's motion to unseal that record, which has been docketed in this case at Docket No. 930.

In support of its search warrant requests, the government filed an Application and Affidavit for Search Warrant, in which Drug Enforcement Administration Task Force Officer ("TFO") James Goodman provided information justifying issuance of the fourteen requested search warrants. (Docket No. 930, Attachment 14 ("Goodman Affidavit")).[2] The Goodman

---

[1] In applications for the wiretaps and for the search warrants at issue here, the two confidential sources were identified as "CS-1" and "CS-2."

[2] The government sought search warrants for fourteen residences associated with the suspected criminal activities of Travis Gentry and the Gentry DTO, including one search warrant for Betty Gentry's residence and her person. Attachments A-1 through A-14 to the Goodman Affidavit listed the people and property to be searched, while Attachments B-1 through B-14 listed the items to be seized. For purposes of this Memorandum, references to "the search warrant" will refer to the search warrant specific to Betty Gentry, as reflected in Attachment A-2

Affidavit, which comprises 102 typewritten pages, contains significant detail regarding TFO

Goodman's extensive professional experience in narcotics investigations, general information

regarding narcotics trafficking enterprises based on Goodman's knowledge and experience, and

approximately 90 pages of case-specific evidence. The case-specific evidence includes, *inter*

*alia*, summaries of the results of physical and remote surveillance efforts, a description of

multiple controlled drug purchases, information provided by CS-1 and (to a much larger extent)

CS-2, excerpts from numerous wiretapped conversations involving the investigation's target

subjects, and a description of each search warrant target's criminal history, if any.

     With respect to Betty Gentry specifically, the Goodman Affidavit contains numerous

references to the alleged role of Betty Gentry and/or her residence in the criminal operation

under investigation, including approximately eight pages specific to her and/or her residence

(Goodman Aff. at pp. 28-35), as well as additional information provided by CS-2 concerning

potential criminal activity by Betty Gentry and/or criminal activity that allegedly had taken place

or was taking place at her residence (*id.* at pp. 11-12). Based largely on information provided by

CS-2 and information gleaned from wiretapped conversations, the Goodman Affidavit asserted

that there was probable cause to believe that Betty Gentry was knowingly allowing Travis

---

and B-2 to Goodman Affidavit, both of which related to Betty Gentry's residence and her person. (*See* Docket No. 930, Attachment 1 (executed search warrant materials)).

Also, on April 6, 2011, approximately 20 days after the search warrants were issued, the government filed an additional affidavit from TFO Goodman containing corrections to certain Goodman Affidavit references to the dates, times, and target phones for certain call summaries, which had been inadvertently transposed. (*See id.*, Attachment 15.) None of these changes related to the content of the call summaries in the Goodman Affidavit. (*Id.*) Although the parties have not referenced these corrections here, the court has analyzed them and has determined that they do not impact the court's disposition of the instant motion.

Gentry to store drugs, currency, and weapons at her residence, that she was allowing cocaine to be cooked into crack cocaine there, and that she was distributing drugs from the residence. (*Id.* at p. 11.) On March 16, 2011, the Issuing Judge issued the requested search warrant, which the government executed on March 17, 2011. (Docket No. 930, Attachment 1.)

## ANALYSIS

### I. Probable Cause Standard

The Fourth Amendment states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation . . . ." U.S. Const. amend. IV. "The protections of personal privacy and property embodied in the amendment require that probable cause "be drawn by a neutral and detached magistrate . . . ." *United States v. Weaver*, 99 F.3d 1372, 1377 (6th Cir. 1996) (quoting *Johnson v. United States*, 333 U.S. 10, 14, 68 S. Ct. 367, 369, 92 L. Ed. 2d 436 (1947)). For the magistrate to be able to perform this official function, the affidavit presented must contain adequate supporting facts about the underlying circumstances to show that probable cause exists for issuance of the warrant. *Id.*

In analyzing whether a search warrant affidavit established probable cause to search, a reviewing court must give "great deference" to the determination of the judge who issued the warrant. *United States v. Archibald*, --- F.3d --- , 2012 WL 2816702, at *2 (6th Cir. July 11, 2012) (submitted for publication) (quoting *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010)). Looking only to the four corners of the affidavit, the court "will find probable cause to support a search warrant if the affidavit establishes 'a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983)). The court "will uphold a probable cause

determination if the issuing judge had a substantial basis for concluding that a search would uncover evidence of wrongdoing," and the decision should be "reverse[d] only if the issuing judge's determinations were arbitrarily exercised." *Id.* (internal quotation marks and citation omitted). Nevertheless, "[f]rom whatever source, the information presented must be sufficient to allow the official to independently determine probable cause; 'his action cannot be a mere ratification of the bare conclusions of others.'" *Id.* (quoting *Gates*, 462 U.S. at 239).

To the extent an affidavit relies on information provided by a confidential informant, a judge "must consider the veracity, reliability, and basis of knowledge of the informant's information; but even an affidavit that supplies little information concerning an informant's reliability may support a finding of probable cause, under the totality of the circumstances, if it includes sufficient corroborating information." *Id.* (internal quotations and citations omitted). "Moreover, 'an explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles [the informant's tip] to greater weight than might otherwise be the case.'" *Id.* (quoting *Weaver*, 99 F.3d at 1377).

## II.    __Application__

Here, Betty Gentry asserts three arguments in support of her contention that the Goodman Affidavit did not establish probable cause to issue the search warrant. First, she argues the Goodman Affidavit constitutes a "bare bones" affidavit. Second, she argues that the Issuing Judge should not have relied on any information provided by CS-1 and CS-2 in making a probable cause determination, because the Goodman Affidavit did not sufficiently establish the veracity, reliability, and basis of knowledge of these confidential sources. Third, she argues that

5

the wiretapped conversations excerpted in the Goodman Affidavit did not establish probable

cause for the search warrant.

**A.      Whether the Affidavit was "Bare Bones"**

Betty Gentry's argument that the Goodman Affidavit is "bare bones" is without merit.

The Goodman Affidavit contains extensive detail regarding the progress of the investigation,

both before and after the government obtained wiretaps.  With respect to Betty Gentry, it

includes excerpts from at least 12 wiretapped telephone calls in which she participated or that

concerned her (*see* Goodman Aff. at pp. 29-35), as well as information independently provided

by CS-2 regarding Betty Gentry's alleged role in the criminal operation, including CS-2's belief

that Travis Gentry had been paying Betty Gentry to utilize her house for drug trafficking

activities (*see id.* at p. 12).  With respect to the excerpts from wiretapped conversations, each

excerpt is followed by TFO Goodman's explanation and interpretation of each recording based

on his knowledge and experience, including the interpretation of certain jargon contained

therein.  Based on those interpretations, TFO Goodman concluded that the recordings showed

that Betty Gentry had knowingly permitted Travis Gentry to utilize her house for drug trafficking

activities and that she was facilitating the Gentry DTO's operations in various respects.

Although a jury will ultimately determine whether the recorded statements are, in fact,

incriminating, the court finds that TFO Goodman's interpretations, taken in context, were

reasonably based on the underlying facts of the investigation and were appropriately considered

by the Issuing Judge.

**2.      Reliability of the Confidential Sources**

As to the reliability of CS-1 and CS-2, the Goodman Affidavit contains even more information supporting their reliability than did the affidavit supporting the government's initial Title III wiretap application, which the court has already found was sufficient to demonstrate reliance on information they had provided. (*See* Docket No. 940 at 30-36.) For instance, in addition to the (already sufficient) corroborating information that the government had presented in support of the first wiretap application, the Goodman Affidavit states that CS-2 had provided a tip that Travis Gentry and another individual, Spencer Randolph, would be traveling to the home of Spencer Randolph to pick up marijuana. (Goodman Aff. at p. 13.) That evening, investigators conducting surveillance of Randolph's residence indeed observed Gentry arrive at the residence in a pickup truck, followed by other suspected members of the Gentry DTO who had been observed supplying drugs to that location just one week earlier. (*Id.*) Thus, through surveillance, investigators independently corroborated CS-2's tip.

Similarly, on a different occasion, CS-2 informed investigators (after the fact) that Gentry had traveled to the residence of Spencer Randolph one day earlier to pick up marijuana. Investigators corroborated the tip through recorded surveillance footage of Spencer Randolph's residence, which showed that Gentry had entered the residence that day, that one of his suspected drug suppliers had then entered the house carrying a black bag, and that Gentry had then exited the house. (*Id.* at 15-16). (*See also id*. at pp. 12 (tip from CS-2 corroborated through intercepted phone calls); 14 (tip from CS-2 corroborated through remote surveillance); 15 (July 4, 2010 tip from CS-2 corroborated through remote surveillance); 55 (February 14, 2011 tip from CS-2 corroborated through surveillance and utility records).

Thus, based on the information contained in the Goodman Affidavit, it appears that CS-2 had consistently provided accurate information to law enforcement, which was independently verified through surveillance and other means. Accordingly, the Issuing Judge justifiably relied on information provided by CS-2 in reaching a probable cause determination.[3]

## C.  Probable Cause

Betty Gentry essentially argues that the intercepted phone call excerpts in the Goodman Affidavit did not provide the Issuing Judge with a basis to make a probable cause determination. Although whether certain intercepted conversations are in fact incriminating will ultimately be for the jury to decide, the excerpts included in the affidavit were highly suggestive that criminal activity had taken place and was continuing to take place at Betty Gentry's residence. For example, the excerpts can fairly be interpreted as establishing that Travis Gentry and his associates were utilizing Betty Gentry's house to buy and sell drugs (*see, e.g.*, Goodman Aff. at pp. 29 (Betty Gentry states that an associate of Travis Gentry came to her house to pick up a "roll" "out of one of them" sacks, and then left money) and 31 (from her home land line, Betty Gentry initiates two conversations between Travis Gentry and Randy Randolph, who discuss preparation of drugs for distribution at her house)); that Betty Gentry stored Travis Gentry's illegal drug proceeds at her house (*id.* at pp. 30 ("[Y]our money is in that trunk in the red box" and 32 (Betty Gentry acknowledges that she received a box of cash on Travis Gentry's behalf and was holding it at her house)); that drug paraphernalia utilized by the Gentry DTO was being stored and utilized at her house (*id.* at 30-31 (Betty Gentry initiates conversation between Travis Gentry and associate Randy Randolph regarding preparation of drugs, during which she states in

_____

[3]As described in the next section, even without reference to any information provided by CS-2, the Goodman Affidavit otherwise established probable cause as to Betty Gentry.

the background that scales used to measure drugs are "there in that drawer")); that she attempted to conceal potentially incriminating evidence located at her house from investigators (*id.* at pp. 32-33 (discussing potential concealment of weapons stored at house, after police presence suspected)); and that she permitted Travis Gentry to utilize vehicles registered in her name to frustrate police investigation into Travis's activities (*see id.* at p. 34 (Betty Gentry consents to let Travis drive her car, because his current car was "too damn hot")). These discussions alone provided more than sufficient evidence to support a finding that, to a fair probability, Betty Gentry's residence contained contraband and/or evidence of a crime.

The information provided by CS-2 presented even more support for a probable cause finding. CS-2 informed law enforcement that Travis Gentry was utilizing Betty Gentry's house to store drugs, money, and weapons, to distribute drugs, and to cook cocaine into crack cocaine. (*See id.* at p. 11.) CS-2 also informed law enforcement that Betty Gentry personally observed the opening of a large shipment of cocaine at her house and that numerous cocaine shipments were made to Betty Gentry's house. (*Id.* at p. 12.) Furthermore, CS-2 advised that Betty Gentry had generally assisted Travis Gentry in his drug trafficking activities and that he was paying her to allow him to cook cocaine into crack cocaine at her house. (*Id.*)

Taken cumulatively, the affidavit demonstrably established probable cause to search Betty Gentry's residence. Granting the requisite deference to the Issuing Judge, the court finds no basis to reverse the Issuing Judge's determination to issue the search warrant.[4]

## CONCLUSION

---

[4]Because the court finds that probable cause was plainly established, the court need not reach the government's alternative argument that, even if probable cause were lacking, the seized evidence would be admissible pursuant to the *Leon* good-faith exception to the exclusionary rule.

For the reasons stated herein, the Motion to Suppress will be denied.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge